LARRY E. MEHAU and MOSES W. KEALOHA, Plaintiffs-Appellants, Cross-Appellees, *v.* GANNETT PACIFIC CORPORATION, A Delaware corporation, dba Honolulu Star Bulletin; KINAU BOYD KAMALII; LEE ENTERPRISES, INC., a Delaware corporation, dba KGMB-TV; HAWAII TRIBUNE HERALD, LTD., a Nevada corporation, dba Hawaii Tribune Herald; WESTERN TELESTATIONS, INC., a Wyoming corporation, dba KITV, Defendants-Appellees, and VALLEY ISLE PUBLISHERS; LESLIE MOORE; RICK REID; GEOFFREY SILVA, and KINAU BOYD KAMALII, Defendants, Cross-Appellants, and SCOTT SHIRAI, KHON-TV, INC., a Delaware corporation, dba KHON-TV; KHVH, INC., a Hawaii corporation, dba KHVH RADIO; UNITED PRESS INTERNATIONAL, a New York corporation; JOHN DOES I-XX; and JOHN DOE CORPORATIONS I-XX, Defendants

NO. 7519

(CIVIL NO. 51880)

FEBRUARY 2, 1983

NAKAMURA, J., RETIRED JUSTICE MENOR, IN PLACE OF LUM, J., RECUSED, CIRCUIT JUDGE ACOBA, IN PLACE OF PADGETT, J., RECUSED, AND CIRCUIT JUDGE TSUKIYAMA, IN PLACE OF HAYASHI, J., RECUSED*

---

\* Chief Justice Richardson, who heard oral argument in this case, retired from the court on December 30, 1982. HRS § 602-10 (1979 Supp.) provides: "After oral argument of a case, if a vacancy arises or if for any other reason a justice is unable to continue on the case, the case may be decided or disposed of upon the concurrence of any three members of the court without filling the vacancy or the place of such justice."

136

OPINION OF THE COURT BY NAKAMURA, J.

Once again the question before us is whether published imputations of criminality may have transgressed the bounds of constitutionally protected speech and press. We are asked to decide whether two public officials can proceed to trial on their defamation suit against a host of defendants from the press and

the electronic media[1] and a State legislator[2] and whether the legislator should have access through the discovery process to records of the Honolulu Police Department that may aid her defense of the action if we determine the two may go forth with the claim against her. The circuit court awarded summary judgments in favor of the legislator and all of the media defendants save the Valley Isle Publishers (the Valley Isle) and its officers. We conclude, however, that the officials ought to be afforded an opportunity to prove they were also defamed and damaged by the United Press International (UPI) and the legislator and that she should be given an opportunity to show such access would not jeopardize other important public interests.

I.

A.

The plaintiffs are Larry E. Mehau (Mehau) and Moses W. Kealoha (Kealoha) who were members of the State Board of Land and Natural Resources during relevant times; the complaint in essence avers they were defamed by untrue accounts of their gross criminality. The genesis of the controversy was a KHON-TV newscast of February 2, 1977 reporting the head of the local criminal "syndicate" then sat on an important State

---

[1] The defendants include Gannett Pacific Corporation, a Delaware corporation, dba Honolulu Star-Bulletin (the Star-Bulletin); Lee Enterprises, Inc., a Delaware corporation, dba KGMB-TV (KGMB-TV); Hawaii Tribune-Herald, Ltd., a Nevada corporation, dba Hawaii Tribune-Herald (the Tribune-Herald); Western Telestations, Inc., a Wyoming corporation, dba KITV (KITV); KHON-TV, Inc., a Delaware corporation, dba KHON-TV (KHON-TV); KHVH, Inc., a Hawaii corporation, dba KHVH Radio (KHVH); United Press International, a New York corporation (UPI); and the Valley Isle Publishers, a Hawaii corporation which published the Valley Isle (Valley Isle).

[2] The legislator is Kinau Boyd Kamalii who was then a member of the State House of Representatives.

board.[3] Though rumors of a "Hawaiian Syndicate" and its "Godfather" had been afloat for months, the newscast was the initial report by the established news media concerning his actual identity.

Subsequently the Valley Isle,[4] a new Maui tabloid without a "track record" for reliability, published a story quoting Adolph Helm as saying his brother, the late George Helm, Jr.,[5] had named Mehau as the "Godfather" of Hawaii's underworld crime.[6] Dennis Stone, a UPI reporter, learned of the article through a radio station employee on the day of its publication, June 15, 1977. Stone then called the Maui News, a well-established semi-weekly Maui newspaper, and had a staff

---

[3] However, KHON-TV and Scott Shirai, the newscaster responsible for the story, have been dismissed from the suit as a result of a settlement effected between themselves and the plaintiffs. *See* Record on Appeal, at 1034.

[4] The Valley Isle, now defunct, was then a bi-weekly tabloid published on Maui which had a normal press run of twelve thousand copies. It had begun publishing shortly before then and was distributed without charge to readers.

[5] The late George Helm was a leader in the native Hawaiian movement who had disappeared while participating in a protest against the use of the island of Kahoolawe as a target island by the military.

[6] The lengthy story that appeared in the June 15 issue of the paper was composed of purported interviews of several anonymous persons and Adolph Helm. This statement was among those ascribed to Helm:

George was doing a heavy trip looking into organized crime. George was wide open. He came out publicly in front of maybe 100 people and named Larry Mehau as the "godfather." And he named people higher up. He said he was going to expose them and all the corruption that was happening.

The article also displayed statements attributed to persons who desired anonymity in prominent boxes. The following appeared in one of them:

Valley Isle: *What did you see?*

A: I saw Larry Mehau come in with Mokiki Kealoha (both of the State Department of Land and Natural Resources). I thought they were probably coming in to tap the owner.

Valley Isle: *What do you mean, 'tap'?*

A: Hit up for protection money.

Valley Isle: *Why would you think that? Are Mehau and Kealoha supposed to be syndicate or something?*

A: Sure, everybody knows that.

Valley Isle: *What did they want?*

A: They talked to George. After they left, somebody asked George what they wanted. He said, 'They told me to cool it, or else.'

There were other statements linking Mehau with criminal elements here and elsewhere.

member read portions of the story to him. He then attempted to reach Adolph Helm by telephone, presumably to seek confirmation of the statements attributed to Helm, but was unsuccessful. He spoke instead to Adolph's father, who told him George Helm, Jr. had said he had been threatened by Mehau. Relying on the parts of the Valley Isle article that were read by the Maui News employee and the statement of George Helm, Sr., Stone composed a news release and caused it to be transmitted over the UPI wire to its subscribers.[7] A follow-up story was also transmitted after Stone spoke to Adolph Helm.[8]

### B.

The Valley Isle story and UPI's coverage thereof, of course, attracted widespread press, radio, and television attention. The Tribune-Herald, a subscriber to the news service, for one published a story substantially replicating the UPI releases on the day after the publication of the controversial article. And on June 17, 1977, it followed through with another story reporting Governor Ariyoshi's response to a query about the

---

[7] The story first disseminated over its wire by UPI read:
Adolph Helm . . . brother of the missing Hawaiian activist George Helm . . . was quoted today in the biweekly Valley Isle Press as naming State Land Board Big Island member Larry Mehau as the "Godfather" of Hawaii's underworld crime. Adoph [sic] Helm also was quoted as reveling [sic] that his brother, now feared dead, said Mehau threatened him when Helm was a musician at Honolulu's Gold Coin Restaurant. The Helm brothers' father confirmed that George Helm said he was repreatedly [sic] threatened. Before he apparently died, George Helm told his brother he had a lot to reveal about Hawaii's organized crime. Adolph Helm also reportedly fingered Marcus Lipske, believed the manager of singer Don Ho, as the local underworld's link with the mainland syndicate.

[8] The second release read:
Adolph Helm, the brother of the missing and feared dead Hawaiian activist George Helm, revealed today that George Helm told many of his followers that State Board of Land and Natural Resources member Larry Mehau of the Big Island is the godfather of Hawaii's underworld. Helm, interviewed at his Molokai residence said his brother told 40 to 50 people prior to a March 'invasion' of Kahoolawe that Mehau and other people—Quote—'higher up' were deeply involved in organized crime. Helm quoted his brother as saying he was planning to expose them and 'all the corruption that was happening.' Helm's apparent death this past March is believed being investigated by Maui County and the F.B.I.

accusations in the Maui publication, a response which essentially was a defense of Mehau's character. Others who were not UPI subscribers published or broadcast varying reports on the controversy. These, however, consisted in the main of the reactions of the Governor, other public officers, public figures, and organizations to the earlier reports of the plaintiffs' link to the nether world of organized crime.

KGMB-TV telecast reports of the charges leveled against the plaintiffs by the Maui tabloid and repeated by UPI, as well as the public reactions thereto, between the 15th and 22nd of June. Though Mehau was identified as the reputed "Godfather," the telecasts invariably mentioned the source of the accusations against him. The Star-Bulletin, KHVH, and KITV also carried accounts of the published accusations, but like KGMB-TV devoted much of their reporting thereafter to the public reaction engendered thereby and to statements issued by other public officials, public figures, and organizations relative to Mehau's character. And these media defendants in their articles, broadcasts, and telecasts likewise noted where the charges originated.

C.

The public issue created by the KHON-TV newscast of February 2, 1977 and the Valley Isle story was relentlessly pursued by Representative Kamalii in the halls of the legislature and beyond. Shortly after the purported expose' by Scott Shirai that a member of a State board was the "Godfather," she introduced two resolutions in the State House of Representatives, which was then in session. The resolutions, House Resolution Nos. 292 and 293, had as their objects a legislative probe into the allegations made by Scott Shirai and twenty-four hour police protection for him. She also issued public statements calling upon the Attorney General and the House Committee on Judiciary to launch investigations into the charges. The Attorney General and the Speaker of the House, however, responded publicly that investigations of such nature were more properly matters for the police to pursue. And the resolutions sponsored by Representative Kamalii failed to

emerge from committee for adoption by the House of Representatives.

The legislator nevertheless continued her efforts to publicize the accusations despite this setback and the closing of the legislative session. On April 6, 1977, she fostered the publication of an article in the Star-Bulletin entitled "Answer Asked to 'Godfather' Charge," and while speaking at a meeting of the Kailua Chamber of Commerce shortly after the crucial story appeared in the Valley Isle, she identified Mehau as the "Godfather." But this did not mark the end of her involvement in the controversy; she was also interviewed by the Valley Isle after the Kailua meeting and a story containing her innuendos that the "Godfather" and Mehau were one and the same appeared in a subsequent issue of the news organ.

### D.

Mehau and Kealoha filed their eleven count complaint against numerous defendants, both named and unnamed, on June 23, 1977. After responsive pleadings were submitted by the defendants who were served and extensive discovery efforts by both plaintiffs and defendants, summary judgments were sought. The circuit court granted judgments in favor of the Star-Bulletin, the Tribune-Herald, KGMB-TV, KITV, KHVH, UPI, and Representative Kamalii. It denied the motion filed by the Valley Isle and its officers. The orders granting the summary judgments were certified thereafter as appealable by the circuit court, and the plaintiffs perfected their appeal to this court. Representative Kamalii in turn appealed from an order foreclosing her attempt to have the Honolulu Police Department produce records and documents related to Mehau and others in order to protect her interests in the event plaintiffs succeeded on their appeal.

II.

A.

I.

The First Amendment represents "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials. *See Terminiello v. Chicago,* 337 U.S. 1, 4; *De Jonge v. Oregon,* 299 U.S. 353, 365." *New York Times Co. v. Sullivan,* 376 U.S. 254, 270-71 (1964). But "erroneous statement is inevitable in free debate," and "it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *Id.* at 271-72 (citation omitted). A rule of law that compels one who would engage in such debate "to guarantee the truth of all his factual assertions—and to do so on pain of libel judgments virtually unlimited in amount—leads to a comparable 'self-censorship.'" *Id.* at 279. Would-be critics "may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." *Id.*

Yet "[t]he need to avoid self-censorship by the news media is . . . not the only societal value at issue" where erroneous statement relating to the conduct of public officials is concerned. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 341 (1974). Recognizing that the absolute protection of "the communications media . . . [would result in] a total sacrifice of the competing value served by the law of defamation," *id.,* the Supreme Court has sought a "proper accommodation between these competing concerns" by extending "a measure of strategic protection to defamatory falsehood" uttered by the media. *Id.* at 342. And "the level of constitutional protection appropriate to the context of defamation of a public person" was defined in *New York Times Co. v. Sullivan, supra.* Under this standard,

[t]hose who, by reason of the notoriety of their achievements or the vigor and success with which they seek the public's attention, are properly classed as public figures and those who hold governmental office may recover for injury to reputation only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth. This standard administers an extremely powerful antidote to the inducement to media self-censorship of the common-law rule of strict liability for libel and slander. And it exacts a correspondingly high price from the victims of defamatory falsehood. Plainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test.

*Id.*

The Fourteenth Amendment rendered it incumbent upon us to extend this "measure of strategic protection" to media defendants against whom damages for defamation are sought by public officials in the courts of the State. Thus,

[a]fter reviewing the *New York Times* decision and its progeny, we defined "actual malice" in *Tagawa v. Maui Publishing Co. (Tagawa II)*, 50 Haw. 648, 652, 448 P.2d 337, 340, *cert. denied*, 396 U.S. 822 (1968) as "'deliberate falsification' of facts or 'reckless disregard' of the truth, *i.e.*, reckless publication despite a high degree of awareness, harbored by the publisher, of the probable falsity of the published statements."

*Rodriguez v. Nishiki,* 65 Haw. 430, 436, 653 P.2d 1145, 1149 (1982).

### 2.

Whether the test of "malice" enunciated in *New York Times* and restated in *Gertz* is applicable to defamation suits brought by public figures against nonmedia defendants was posed for decision in *Rodriguez v. Nishiki, supra.* Initially, we observed "it is now generally recognized, at least with regard to defamation actions involving public officials and public figures, that the *New York Times* standard of actual malice is

applicable to both media and nonmedia defendants." *Id.* at 436, 653 P.2d at 1149 (citations omitted). We further sensed a denial of this strategic protection to nonmedia defendants "would result in the anomalous situation where media defendants, with a greater capacity for damaging an individual's reputation because of their wide dissemination of information, would be accorded greater rights than other speakers in society." *Id.* at 437, 653 P.2d at 1149. And the Supreme Court, we noted, "while not articulating a standard explicitly applicable to nonmedia defendants, has made no distinction between media and nonmedia defendants and has further abandoned the traditional dichotomy between libel and slander actions. *See e.g., St. Amant v. Thompson,* 390 U.S. 727 (1968) (televised speech); *Garrison v. Louisiana,* 379 U.S. 64 (1964) (press conference); *New York Times v. Sullivan, supra* (editorial advertisement)." *Id.* at 437, 653 P.2d at 1149-50. Our conclusion therefore was that the "actual malice" standard "should be applied without regard to the publisher's designation as a 'media' or 'nonmedia' defendant." *Id.* at 437, 653 P.2d at 1150.

3.

Whether the plaintiffs were obliged to present "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth," *Gertz v. Robert Welch, Inc.,* 418 U.S. at 342, in order to avoid the grant of summary judgment to the defendants was another question raised in *Rodriguez v. Nishiki, supra.* Though mindful that some courts have departed from normal summary judgment procedure and have awarded summary judgments to defendants after evaluating all the evidence "in its most reasonable light" and finding the plaintiffs have not demonstrated actual malice "with convincing clarity," we concluded this departure from the norm was not justified. *Rodriguez v. Nishiki,* 65 Haw. at 438-40, 653 P.2d at 1150-51. We chose to adhere to the apparent majority view which finds expression in *Nader v. de Toledano,* 408 A.2d 31 (D.C. Cir. 1979), *cert. denied,* 444 U.S. 1078 (1980), to this effect:

The question to be answered by the trial court must and will remain the same—Is there a genuine issue of material fact from which a reasonable jury acting reasonably could find actual malice with convincing clarity? Thus, the court examines the evidence, taking all permissible inferences and resolving questions of credibility in plaintiff's favor to determine whether *a reasonable jury acting reasonably could find actual malice with convincing clarity.* The question to be resolved at summary judgment is whether plaintiff's proof is sufficient such that a reasonable jury could find malice with convincing clarity, *and not whether the trial judge is convinced of the existence of actual malice.*
*Id.* at 50 (emphasis in the original). Our conclusions in this regard were:

If there is a factual dispute about defendant's state of mind with regard to actual malice, summary judgment should not be granted. As the Supreme Court recently noted in *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n.9 (1979), "[t]he proof of 'actual malice' calls a defendant's state of mind into question, *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964) and does not readily lend itself to summary disposition."

Other than the higher standard of proof which the plaintiff must carry as a matter of law, the normal summary judgment procedure should be followed in "actual malice" defamation actions.

*Rodriguez v. Nishiki,* 65 Haw. at 439, 653 P.2d at 1151.

### B.

Having set forth these governing precepts, we embark on an examination of the circuit court's award of summary judgments to the media defendants other than the Valley Isle, reserving for subsequent discussion the grant of summary judgment to Representative Kamalii because of the possibility that legislative incumbency may also have freed her from being called to account for her utterances.

At the outset we note there is no question that Mehau and Kealoha are plaintiffs whose recovery of damages from the defendants is conditioned upon a showing of "actual malice."

We further observe there are substantial differences between the relevant conduct of UPI and the actions of the other media defendants calling for a separate consideration of UPI's possible liability for defamation damages from that faced by the others. UPI's putative accountability is addressed first.

1.

The circuit court's summary judgment awards in favor of all the media defendants except the Valley Isle display a keen appreciation of one of the societal values implicated in a defamation suit of this nature, "[t]he need to avoid self-censorship by the news media." *Gertz v. Robert Welch, Inc.,* 418 U.S. at 341. We do not deprecate the court's concerns with respect to the necessity for free debate on public issues. Still, we are unable to affirm the award of summary judgment to UPI, for there is evidence in the record from which a jury could find the news service acted with reckless disregard for the truth in transmitting the stories that named Mehau as "the 'Godfather' of Hawaii's underworld crime."

The record manifests the two UPI dispatches did more than report the publication of a sensationalized article about the disappearance of George Helm, Jr. and a companion while engaged in a protest against the use of Kahoolawe as a target island by the military. To be sure, the wire service releases consisted mostly of "quotes" allegedly drawn from the Valley Isle story, including several ascribed to Adolph Helm. But the purported "quotes" were strung together in a fashion that focused on Mehau as the "Godfather" of the underworld of local crime. And by innuendo and inference the dispatches further implicated Mehau in the death of George Helm, Jr., linked Mehau with "the mainland syndicate," and involved him in "all the corruption that was happening." Moreover, where the Valley Isle described one occasion on which Helm had purportedly been threatened by Mehau and Kealoha, the wire service quoted George Helm, Sr. as saying his son had been "repeatedly threatened." Any of the foregoing accusations, if untrue, concededly were defamatory.

The case law of pertinent First Amendment litigation in the Supreme Court renders it clear

that reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.

*St. Amant v. Thompson,* 390 U.S. at 731. *See also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 153 (1967); *Garrison v. Louisiana,* 379 U.S. at 74. UPI asserts in defense of its publication of the defamatory material that Dennis Stone, the reporter responsible therefor, "had no serious doubts concerning their truth of the charges, and he was not aware of any facts which raised any reasonable question as to their validity." It further claims he "had no serious concern as to the reliability of [t]he Valley Isle" and if "the charges were distorted in Stone's stories, his errors were completely unintentional." Yet, the relevant teachings of the Supreme Court are that

[t]he defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.

*St. Amant v. Thompson,* 390 U.S. at 732 (footnote omitted).

From a review of the record, we can only conclude "there is a factual dispute about defendant's state of mind with regard to actual malice." *Rodriguez v. Nishiki,* 65 Haw. at 439, 653 P.2d at 1151. UPI's treatment of the information gleaned from another source, the fact that the source was a new publication apparently given to sensationalizing the "news," and the anonymity of the authors of some of the crucial accusations pub-

lished by the Valley Isle are a few of the factors we believe could lead to a finding by a jury that UPI's republication of the charges of criminality was not "made in good faith" or they were such that "only a reckless man would have put them in circulation." *St. Amant v. Thompson,* 390 U.S. at 732.

2.

The two news releases transmitted over the UPI wire were received by the Tribune-Herald and republished with a few minor changes and the addition of two paragraphs to the second release that did not materially alter their content. The plaintiffs urge the Tribune-Herald's culpability under these circumstances cannot be distinguished from that of the wire service. We disagree.

The Tribune-Herald was a subscriber to one of the leading news services in the United States; it had no reason to question the reliability of the organization as a news gatherer. Plaintiffs nonetheless would have us impose a duty of prior investigation upon the Tribune-Herald. A clearer inducement than this to the media self-censorship decried by the Supreme Court would be difficult to conjure.

The record indicates the Hilo newspaper made unsuccessful attempts to reach Mehau for comment when the dispatches were received and the story appearing in its June 17, 1977 issue noted these efforts to seek a response to the charges. Other than this, what appeared in the Tribune-Herald's articles was what UPI had transmitted. The newspaper neither slanted nor embellished what was taken off the wire, and the record is barren of any indication that its publication of the stories did not constitute "good faith" reporting of news of substantial public interest. No basis for a possible jury finding that there was a reckless disregard for the truth appears.

While the plaintiffs may have been defamed, the First Amendment exacts a high price from possible victims of defamatory falsehood who hold public office. *Gertz v. Robert Welch, Inc.,* 418 U.S. at 342. We think the Tribune-Herald was entitled to rely on UPI's reputation as a reliable source of news. *See Waskow v. Associated Press,* 462 F.2d 1173, 1176 (D.C. Cir. 1972); *Gay v. Williams,* 486 F. Supp. 12, 16-17 (D. Alaska

1979). Otherwise, it may be reduced to an organ reporting news of Hilo and the Big Island.

### 3.

We are also of the opinion that the record is devoid of evidence from which a jury may infer there was a reckless disregard for the truth in the reporting of the public dispute fanned by the Valley Isle on the part of other elements of the news media.

KGMB-TV probably was the member of the electronic media giving the controversy the widest coverage; its reporting of the incriminatory charges flung by the Valley Isle extended over a period of eight days. Naturally, the reports all named Mehau as the putative "Godfather." But the station also invariably identified the source of the charge as the article in the Maui tabloid. Furthermore, the repeated statements regarding Mehau's reputed leadership of the underworld were aired in connection with other comments and views on the controversy, particularly those expressed by public officials and figures. For example, the June 15 newscast focused on Representative Kamalii's reproof of the Governor and the Chairman of the State board on which Mehau served for coming to Mehau's defense. And the telecast of June 22 was devoted for the most part to Protect Kahoolawe Ohana and the organization's defense of Mehau and criticism of the Valley Isle's "yellow journalism."

The entries of the remaining media defendants, the Star-Bulletin, KHVH, and KITV (a newspaper, a radio station, and a television station respectively) into the then raging controversy came relatively late. Their involvement began with reports of the Governor's reaction to the Valley Isle and UPI stories, and their coverages of the dispute that had engendered much public interest were largely confined thereafter to reporting the reactions of others. Thus they also aired the statement of the Chief of Police of Maui County, the reactions of Representative Kamalii and Mayor Fasi of the City and County of Honolulu to the Governor's defense of Mehau's character, and the views expressed by other public figures and organizations relative to Mehau, the Governor, and the Valley Isle.

Viewing the evidence presented to the circuit court in the most favorable light for plaintiffs, we still arrive at a conclusion that a jury could not reasonably find actual malice with convincing clarity where the actions of KGMB-TV, the Star-Bulletin, KHVH, and KITV are concerned; the recklessness demanded by *New York Times Co. v. Sullivan, supra,* just does not appear.

### III.

Turning from the claims against the media defendants to the claim against the lone nonmedia defendant, we reiterate at the outset that when defamation actions are brought by public officials the "actual malice" standard is applicable "without regard to the publisher's designation as a 'media' or 'nonmedia' defendant." *Rodriguez v. Nishiki,* 65 Haw. at 437, 653 P.2d at 1150. And in this case, the nonmedia defendant's liability for damages may also hinge upon the context within which the defamation occurred.

### A.

Representative Kamalii's involvement in the public debate on Mehau's character, as we observed, antedated the publication of defamatory material by the Valley Isle. She plunged into the controversy surrounding his purported Jekyll-Hyde personality by introducing two resolutions in the State House of Representatives shortly after KHON-TV first reported the overlord of local crime also sat on an important public board. But her direct reference to Mehau as the "Godfather" came after the close of the 1977 legislative session and the demise of the resolutions,[9] and at a meeting of the Kailua Chamber of

---

[9] Although Article III, § 15 of the State Constitution provides that "[a]ny bill pending at the final adjournment of a regular session in an odd-numbered year shall carry over with the same status to the next regular session," there is no provision that extends the viability of resolutions beyond the adjournment of the session in which they are introduced.

Commerce. Still, we have said there are no temporal and spatial limitations on the immunity from suit afforded by Article III, § 7 of the State Constitution.[10] *See Abercrombie v. McClung,* 55 Haw. 595, 600, 525 P.2d 594, 597 (1974). The question then is whether accusations that were not hurled in a legislative setting were nonetheless made "in the exercise of . . . [Representative Kamalii's] legislative function[s]." *Id.*

The legislator claims "any statements allegedly made by . . . [her] with respect to the 'Godfather' of the Hawaii criminal syndicate" were absolutely privileged since they "were made in clarification of House Resolutions Nos. 292 and 293 which were subject matter of legitimate legislative concern." She maintains the remarks were uttered in the exercise "of her legislative function . . . to keep the public informed and to serve the public interest." It cannot be denied that crime in Hawaii and its perpetrators are matters of prime legislative concern and informing the public of legislative proceedings would further the public interest. Nevertheless, we hesitate to affirm the award of judgment to Representative Kamalii on the basis of the record presented. For what little there is in the record relative to the statements and the settings in which they were made tells us we are not confronted with a situation like that in *Abercrombie v. McClung, supra.*

The allegedly slanderous statement by Senator McClung was passed in an interview conducted in his legislative office a few hours after a speech on the floor of the Senate in which he discussed the University of Hawaii and its faculty. In our decision we reviewed the history of the pertinent immunity clause and found the intent of the delegates to the Constitutional Convention of 1950 was to extend broad immunity to legislators. But we recognized the immunity was only effective

---

[10] Article III, § 7 of the State Constitution reads:

No member of the legislature shall be held to answer before any other tribunal for any statement made or action taken in the exercise of the member's legislative functions; and members of the legislature shall, in all cases except felony or breach of the peace, be privileged from arrest during their attendance at the sessions of their respective houses, and in going to and returning from the same.

"for any statement made or action taken in the exercise of . . . legislative functions." *See* Hawaii Const. art. III, § 7. And the actual scope of the privilege, we concluded, was left to judicial determination "on a case by case basis." *Abercrombie v. McClung,* 55 Haw. at 600, 525 P.2d at 597.

That Senator McClung's erroneous statement of fact regarding Plaintiff Abercrombie's involvement in an activity condemned earlier on the Senate floor was in the exercise of the Senator's legislative functions is beyond cavil. But here, an immunizing nexus between Representative Kamalii's legislative tasks and her identification of Mehau as the "Godfather" of local crime is not so readily discernible. The averred slander occurred after the adjournment of the legislative session in which the two resolutions stimulated by Scott Shirai's expose′ were introduced; the session's closing also marked the demise of the proposals for legislative policy declarations. And a crucial defamatory remark ascribed to the defendant came in a speech purportedly delivered to a group of Windward Oahu businessmen by a lawmaker whose constituency resided in Waikiki and Kapahulu.

We would be remiss if we were to agree with the circuit court on the skimpy record proffered for review that the legislator undisputably was performing a legislative function rather than a partisan political chore as plaintiffs contend. For the facts uncovered thus far, viewed in a most favorable light for plaintiffs, do not lead to an inescapable conclusion that the post-session remarks of the representative were constitutionally privileged. "[S]ummary procedures present a treacherous record for deciding issues of far-flung import; and . . . it is part of good judicial administration to withhold decision of the ultimate questions . . . until the record presents a more solid basis." *State v. Zimring,* 52 Haw. 472, 476, 479 P.2d 202, 204-05 (1970) (citation omitted).

B.

Having decided the award of summary judgment premised on the claimed privilege was not justified, we turn to the question of whether "there is a [remaining] factual dispute about . . . [the legislator's] state of mind with regard to actual

malice." *Rodriguez v. Nishiki,* 65 Haw. at 439, 653 P.2d at 1151.

When the Valley Isle article appeared, Representative Kamalii apparently pounced on it as a reason for publicly characterizing Mehau as an arch criminal.[11] Yet in the interview published in a later issue of the tabloid, she equivocated when a specific question about Mehau was put to her. Her response was "I can't say that he is the 'godfather' or that he isn't the 'godfather'."[12] If her basis for circulating the "name" of the "Godfather" was the Valley Isle story, the factors and considerations that could render UPI liable for defamation could likewise lead to a finding by a jury that only a reckless person would have put the "name" in circulation. *See St. Amant v. Thompson,* 390 U.S. at 732.

### IV.

The decision to set aside the summary judgment awarded Representative Kamalii compels our consideration of the issue raised in her cross-appeal, whether the circuit court abused its discretionary authority when it foreclosed the attempt to

---

[11] The plaintiffs aver Representative Kamalii made the following statements at the Kailua Chamber of Commerce meeting:

I have just been informed that Adolph Helm has released the "name" on Maui and therefore I will tell you here. The name is that of big island rancher Larry Mehau.

[12] The story published in the Valley Isle consisted of a series of questions put to Representative Kamalii and her responses thereto, including these:

Valley Isle: *You had information that Mehau was involved in organized crime before this time?*

Kamalii: Well, let me put it this way: When I called for investigation of Scott Shirai's charges (that the "godfather" sits on a State Board), the only name that people whispered in the halls was Larry Mehau. Without any evidence to really pin it on him, of course. But the people saying his name were elected officials and reporters and responsible people on the street. But there was no concrete proof that this is so. That's what makes it extremely difficult.

Valley Isle: *That's why you haven't mentioned his name?*

Kamalii: Right. Just naming the name is wrong. However, I do know many people are being investigated. To put this together you can talk to some of the police officers and so on and so forth and find that he is known to have been seen with underworld people. But it's hard to get a lot of people to talk. You get the birds flocking together situation. So I can't say that he is the "godfather" or that he isn't the "godfather." But that is the only name that I have ever heard in that context.

obtain discovery of evidence in the records of the Honolulu Police Department that purportedly would "support her defense of truth."

## A.

Representative Kamalii initiated her discovery efforts by serving a notice of deposition and a subpoena duces tecum upon the Custodian of Records of the Honolulu Police Department. When this failed to yield evidence considered material to her defense, she caused a subpoena duces tecum to be served on the Chief of Police, directing the Chief or an authorized subordinate to produce "any and all documents, records, reports, and/or memoranda of or relating to" Mehau and a number of other persons. The Corporation Counsel of the City & County of Honolulu (the City) responded; he informed defendant's counsel by letter that the Police Department would "not be able to comply with the subpoena . . . without a court order delineating the protection that the Police Department requires for its documents." He suggested instead the filing of a motion to compel discovery so the circuit court could properly limit discovery "to relevant matters not otherwise privileged." An order compelling discovery was subsequently entered on defendant's motion.

Rather than advising compliance with the order, the Corporation Counsel acting on the City's behalf then moved for a reconsideration of the circuit court's decision, asserting the records sought by the defendant were "protected under the privileges contained in *Tighe v. City and County of Honolulu.*" The motion was supported by an affidavit of the Chief of Police stating *inter alia* that a release of the documents would disclose the identities of persons who supplied information on assurances that their names would not be revealed. The court agreed that the records were privileged, and an order granting the motion for reconsideration and denying the motion to compel discovery was entered. The denial of discovery was appealed to this court by the defendant after plaintiffs' interlocutory appeal from the summary judgments was allowed by the circuit court.

## B.

The Hawaii Rules of Civil Procedure, like the federal procedural rules, reflect a basic philosophy that a party to a civil action should be entitled to the disclosure of all relevant information in the possession of another person prior to trial, unless the information is privileged. *Kalauli v. Lum,* 1 Haw. App. 284, 287, 617 P.2d 1239, 1241 (1980); Rule 26 HRCP; 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2001, at 15 (1970). Citing *Tighe v. City & County,* 55 Haw. 420, 520 P.2d 1345 (1974), and Rule 510 of the Hawaii Rules of Evidence,[13] the City argues the information sought by the defendant is indeed privileged. It maintains the documents sought by defendant contain information gathered in an ongoing police investigation and their release may jeopardize the probe as well as reveal identities that should be kept inviolate.

In *Tighe* we acknowledged "[i]t has generally been held that there should be no absolute governmental privilege insulating police records from discovery ... in the absence [of a] specific statute granting such a privilege." *Id.* at 422, 520 P.2d at 1346-47. Although we found no such statute, we said the "[p]ublic interest in preservation of confidentiality and secrecy may be sufficient reason for insulation of police or other governmental records from discovery in special, individual cases." *Id.* But we further held the "claims of privilege for such records on this basis require documentation and argument by the governmental agency asserting the privilege, and subsequent judicial evaluation of the claim[s]." *Id.*

---

[13] Rule 510, Haw. R. Evid., provides in part:
(a) Rule of privilege. The government or a state or subdivision thereof has a privilege to refuse to disclose the identity of a person who has furnished information relating to or assisting in an investigation of a possible violation of law to a law enforcement officer or member of a legislative committee or its staff conducting an investigation.
Although this evidentiary rule iterates a privilege not to disclose the identities of persons furnishing information on law violations, it governs the *use* of such information at trial. Since the issue before us is related to pre-trial discovery, we do not reach the question of the applicability of Rule 510 here.

Representative Kamalii argues the circuit court erred in upholding the City's assertion of privilege because the requisite documentation was lacking. She also contends the circuit court's failure to conduct an *in camera* inspection of the records in question prior to ruling constituted an abuse of discretion. The City counters with a proposition that the affidavit of the Chief of Police adequately corroborated its claim that the public interest in law enforcement outweighed the defendant's interest in obtaining discovery and there was no need for an *in camera* look at the records.

The "pendency of a criminal investigation is a reason for denying discovery of investigative reports," *Swanner v. United States,* 406 F.2d 716, 719 (5th Cir. 1969), and the circuit court may well have been dealing with a "special, individual case" where there was "reason for insulation of police . . . records from discovery." *Tighe v. City & County,* 55 Haw. at 422, 520 P.2d at 1346-47. Yet the privilege is seldom one of indefinite duration, for the underlying inquiry usually has "a reasonable terminus." *Capitol Vending Co. v. Baker,* 35 F.R.D. 510, 511 (D.D.C. 1964). Thus the passage of time since the circuit court's ruling may have altered the circumstances, and a current evaluation of the City's claim of privilege would best serve the interests of all concerned, as well as judicial economy.[14]

The summary judgments in favor of the Star-Bulletin, the Tribune-Herald, KGMB-TV, KITV, and KHVH are affirmed; the summary judgments in favor of UPI and Representative Kamalii are set aside. The case is remanded for further proceedings consistent with this opinion.

---

[14] Though the circuit court is vested with discretion in this matter, we would not consider any decision to conduct an *in camera* inspection of records an abuse of discretion.

We also believe such an inspection would put the circuit court in a better position to fashion protective orders where the interests of justice require.

*David C. Schutter (Judith Ann Pavey* with him on the briefs; *David C. Schutter,* Attorney-at-Law, A Law Corporation, of counsel) for plaintiffs-appellants.

*Paul Alston (James T. Paul* with him on the brief; *Paul, Johnson & Alston,* of counsel) for defendant-appellee UPI.

*Steven K. Christensen* for defendant-appellee Hawaii Tribune-Herald.

*Clyde Wm. Matsui (Kobayashi, Watanabe, Sugita & Kawashima,* of counsel) for defendant-appellee Lee Enterprises.

*David J. Dezzani (Goodsill, Anderson & Quinn,* of counsel) for defendants-appellees Gannett Pacific Corp. & KHVH, Inc.

*Burnham H. Greeley (Genevieve S. Richardson* with him on the brief; *Carlsmith, Carlsmith, Wichman & Case,* of counsel) for defendant-appellee Western Telestations.

*David L. Turk (Donna M. Woo* with him on the briefs; *David L. Turk,* Attorney-at-Law, A Law Corporation, of counsel) for cross-appellant Kamalii.

*Faye Koyanagi (John W. K. Chang* on the brief), Deputies Corporation Counsel, for Intervenor City & County of Honolulu.

*Edward Y. N. Kim* on the brief for defendants-cross-appellants Valley Isle, Moore, Reid & Silva.

CONCURRING AND DISSENTING OPINION OF
CIRCUIT JUDGE TSUKIYAMA

I concur as to all Defendants except Hawaii Tribune Herald, Ltd. (HTH). In my view, the same issue of fact exists as to the "good faith" of both UPI and HTH in publishing patently defamatory statements.

I subscribe to the majority opinion's thoughtful analysis of the legal precepts which govern the disposition of the issues herein. However, it is my opinion that in a summary judgment setting there are other considerations which must be specifically addressed and emphasized in balancing First Amendment guarantees against the right of an individual to privacy and protection against defamatory lies. These considerations require a reversal as to HTH.

The mandate of *New York Times Co. v. Sullivan,* 376 U.S. 254 (1964), is that the public interest which is subserved by the First Amendment requires the courts to shield any person or the established media from liability for defamatory lies about a public official unless the official defamed can establish with convincing clarity that the defamatory lies were made with "'actual malice' - that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 280. The essence of "reckless disregard" is "good faith." *St. Amant v. Thompson,* 390 U.S. 727 (1968).

The qualification of "good faith" reflects a modicum of protection for the individual public official which the *Times* rule allows in recognition of the rights of the public official as an individual. The distinction between the public official as a public servant and as an individual was aptly expressed in the dissenting opinion in *St. Amant v. Thompson, supra,* and repeated in *Tagawa v. Maui Publishing Co.,* 50 Haw. 648 at 655 (1968).

The occupation of public officeholder does not forfeit one's membership in the human race.

In applying the *Times* rule in a summary judgment setting, we must recognize that this rule does not confer upon any person or the established media a license to publish defamatory lies about a public official. Neither *Times* nor its progeny would hold that the First Amendment immunizes any person or the established media from civil liability for defamation. Nowhere is it suggested, and certainly we should not conclude, that *Times* requires the courts to place a premium upon reckless lies to ensure the ascertainment of truth or to presume that the public is interested in or benefits from such defamatory lies about the personal qualities and activities of public officials.

In the process of balancing First Amendment guarantees against the rights of a public official as an individual, we must be mindful of the existence of public interests which compete with the particular interest which is protected by the *Times* rule. It is axiomatic that the public interest is subserved by uninhibited, robust and wide-open debate on public issues and officials and that the dissemination of erroneous information must be protected as a concommitant of such debate. On the other hand, the public interest is also subserved by the recruit-

ment and retention of competent public officials and by the ascertainment of truth.

A public official is not stripped of his private identity and integrity by virtue of his office. To expose an individual to reckless and vicious defamatory lies of a personal nature without providing any remedy therefor or an opportunity for vindication, merely because the individual provides a few hours of uncompensated service to the public, would effectively discourage any sensible, highly qualified individual from consenting to public service. The absence of such individuals from public service clearly would be contrary to the public's best interest.

We must be sensitive also to the public's interest which is subserved by the ascertainment of the truth. A summary judgment against a public official in a defamation action terminates the legal proceeding which is intended to provide the parties with an opportunity of demonstrating, and the public of determining, the truth or falsity of the defamatory matter published. It thereby precludes the ascertainment of truth and deprives the public of any basis for the vindication or condemnation of the public official. Unless there is clearly no genuine issue of material fact for consideration by a jury, a summary judgment in a defamation action merely creates doubt and suspicion and subserves neither the interest of the public nor the public official.

In imposing limitations upon First Amendment guarantees, the established media cannot be held to the standard of an insurer of the truth of everything that it publishes. Such an obligation would effectively stifle the First Amendment. However, the imposition of a "good faith" requirement in the publication of defamatory statements about the personal qualities or activities of a public official does not have the effect of suppressing the kind of debate on public issues and officials which would subserve the public's interest. *St. Amant v. Thompson, supra.* But, a summary judgment against a public official in a defamation action definitely would have the effect of suppressing, and encouraging speculation and distortions about, the truth. Depending on the facts of each case, the limitation which the "good faith" requirement places upon First Amendment guarantees may indeed be *de minimus* as

compared to the irreparable loss to the public resulting from the suppression of the truth and the irreparable injury to the public official.

In light of the foregoing considerations, it is my opinion that the majority opinion's analysis, which leads to the conclusion that there is a genuine issue of fact as to UPI, applies to HTH.

In determining whether there is a genuine issue of fact as to the "good faith" of HTH, the Court must address the question of whether the statements published "are so inherently improbable that only a reckless man would have put them in circulation" *St. Amant v. Thompson,* 390 U.S. at 732. See also *Goldwater v. Ginzburg* 414 F.2d 324 (2nd Cir. 1969) cert. denied, 396 U.S. 1049 (1970).

On June 16, 1977, HTH published a virtually word-for-word account of the UPI story which was released on June 15, 1977. HTH added the story headline "Godfather Named." HTH made several unsuccessful attempts to contact Mehau prior to its publication of the initial UPI story.

The story headline composed by HTH could be construed as implying that there existed a "godfather" and that the story merely identified him. The story contained no basis for this implication and there was no indication that the persons making the charge had any facts or personal knowledge relative thereto. There can be no question of the seriousness of the statements made in the publication and of their public importance. Neither is there any question of the patently defamatory nature of the allegations and the irreparable injury it would cause a public official if untrue. Moreover, if untrue, such allegations would serve no better purpose than to recklessly undermine the public's confidence in its public officials and government generally. The public's interest is not subserved by the erosion of the public's confidence in its government officials as a result of defamatory lies.

Given what appears to be the circumstances surrounding the initial dissemination of the UPI story, there appeared to be no basis for the urgent publication of the story. It does not appear that a responsible investigation of the allegations prior to its publication would have jeopardized the public's interest.

Indeed, given the nature of the allegations, the public's interest in the truth thereof, and the individual's right against defamatory lies, the public's interest would have been subserved only by a responsible and balanced presentation of the allegations and the facts pertinent thereto.

The UPI story identified Mehau as a member of the State Land Board and thereby must have alerted HTH that he held a position of public trust. In light of the serious and patently defamatory nature of the UPI story, and the position of public trust held by the subject, a jury could find that the allegations were "inherently improbable" and that there was an obvious basis for doubting the veracity thereof.

HTH asserted that it relied entirely upon UPI for the accuracy of the story and that it had no reason to doubt its accuracy. Even if these assertions were true, such reliance and belief would not preclude a finding by a jury of "actual malice," i.e. that the defamatory allegation was made with reckless disregard of its truth or falsity. Similar assertions were responded to in *Goldwater v. Ginzburg, supra.*

> Reliance upon newspaper articles . . . and upon accurate reprinting of another's letter are only factors which, with other factors, are probative of whether the publisher of the cumulated material was motivated by actual malice when he caused the full material to be published. Repetition of another's words does not release one of responsibility if the repeater knows that the words are inherently improbable, or there are obvious reasons to doubt the veracity of the person quoted or the accuracy of his report. *Id.* at 337.

In the circumstances surrounding HTH's publication of the initial UPI story, I believe that there exists a factual dispute as to whether the HTH publication was made with "actual malice," and further that a reasonable jury acting reasonably could find "actual malice" with convincing clarity.

I would reverse and remand as to HTH.