*In re* MARRIAGE OF MARK DANIELS, Petitioner, and RUTH DANIELS, n/k/a Ruth Davis, Respondent (Don Thomas, Contemnor-Appellant).

First District (5th Division)   No. 1—90—1265

Opinion filed October 30, 1992.

Roland W. Burris, Attorney General, of Springfield (Jan E. Hughes, Assistant Attorney General, of Chicago, of counsel), for appellant.

Melvyn H. Berks, of Des Plaines, for petitioner.

JUSTICE GORDON delivered the opinion of the court:

Nearly five years ago, respondent Ruth Davis (Davis) was shot and injured by an unknown assailant whom she believed to be her ex-husband, petitioner Mark Daniels (Daniels). The circuit court ordered that the two minor children (then five and eight years old) be moved immediately from Davis' home to Daniels' home, on the basis that the children might inadvertently be caught in the "line of fire" if the unknown assailant again attempted to shoot Davis.

Respondent Davis then sought to have the children returned to her, arguing that they should not be living with petitioner Daniels, who was a prime suspect in the attempted murder investigation.

Petitioner took the discovery deposition of contemnor Don Thomas, an Illinois State Police officer and a nonparty to this dissolution of marriage case, and Thomas refused to disclose certain requested information about the criminal investigation other than the fact that petitioner and his brother were suspects.

The trial court, recognizing a limited law enforcement investigatory privilege, ordered contemnor Thomas to disclose some of the information requested by petitioner. Thomas refused, claiming all of the information was privileged. The parties, contemnor and the trial court agreed that to facilitate appeal Thomas would be held in civil contempt and fined $1,000 for each day he refused to comply with the discovery order.

Thomas appeals from the contempt order and the fine. This court stayed the judgment pending appeal. A brief has also been filed on behalf of the two minor children, Jennifer and David Daniels. Respondent Davis has not appeared in this court.

We find no abuse of discretion in the trial court's entering a finding of contempt, but because the issues here were largely matters of first impression raised by the contemnor in good faith, we vacate that finding and the fines imposed thereunder.

FACTS

In September 1987, the marriage of Daniels and Davis was dissolved and Davis was given custody of the two minor children.

On October 25, 1988, Daniels filed an emergency petition for temporary and permanent custody of the two children, then five-year-old Jennifer and eight-year-old David. Daniels alleged that on September 21, 1988, at 2 a.m., Davis returned home from her job as a bartender. A person lying in wait outside her home shot five bullets at her, two of which struck her. Following the shooting, a man telephoned Davis' home and told her father that "we'll get her next time." Daniels believed that the shooting was connected with Davis' daily use of illegal drugs.

Daniels also alleged in his petition that the State Police had provided Davis with protection and that the State Police had moved Davis and the minor children to an unknown location because she was "in physical danger of further attack." Daniels asked for temporary and permanent custody and that the children be allowed to "commence a normal existence free from the danger of an assassin's bullet."

On November 1, 1988, Davis filed a response to the emergency petition, alleging that it was her belief that "the assassination attempt was perpetrated by" Daniels. Davis denied using drugs.

On November 3, 1988, Sergeant Thomas briefly testified in court regarding the investigation of the attempted murder of Davis. Although there is no transcript in the appellate record, Thomas apparently testified in open court that there were four suspects, including Daniels and Daniels' brother. Thomas also testified *in camera*. (While the transcript of that testimony has since been made available to the parties, it also is not contained in the appellate record.) On that day, the court granted Daniels' petition for temporary custody. Davis would be permitted to visit with the children "frequently, with appropriate police protection." The court further or-

dered that the transcript of the *in camera* testimony of Thomas be impounded.

On December 8, 1988, the court entered an order enjoining Davis from trying to see the children without "proper police protection." No visitation was to occur at Davis' home. On December 15, 1988, the court entered an order providing for protected visitation, *i.e.*, the children could visit Davis at her home only if an Island Lake police officer first "completely check[ed] out the facility. Said officer shall remain on the premises for the entire period of visitation ***. In addition, he shall park a marked police vehicle in front of said residence." Davis' father was to be deputized by the Island Lake police and was to remain on the premises during visitation "for additional protection."

On January 31, 1989, at a status hearing, the court ordered Daniels to "subpoena the Island Lake Police Dept. for the next status date," and pay for any related costs. On February 22, 1989, the court entered an order making it the obligation of *Davis'* attorney to subpoena the chief of the Island Lake police department "for testimony *** relative to security for visitation."

On March 21, 1989, Davis notified the court that the Island Lake police department would no longer act as a supervisor for visitation. The court then began permitting unsecured visits, and those visits have apparently continued to the present time.

On June 8, 1989, Daniels filed a petition referring to the November 3, 1988, "gag" order regarding Thomas' *in camera* testimony. Daniels asked for leave to depose Thomas and question him "concerning his *in camera* testimony taken on November 3, 1988, as well as with regard to any matters Sgt. Thomas has learned through his investigation concerning the shooting incident" of Davis.

In addition, on June 8, 1989, the court entered an order that the court reporter for the November 3, 1988, hearing shall "transcribe the testimony *in camera* of Sgt. Thomas and make same available to [Davis'] attorney, [Daniels'] attorney and the children's attorney only." Furthermore, all parties were allowed to depose Thomas. "The parties shall be able to question Sgt. Thomas on matters covered by his *in camera* testimony of 11/3/88. [Any] matter obtained at that deposition by any attorney shall not be published to others."

On July 17, 1989, the court entered an order stating: "The gag order previously entered concerning Detective Thomas' *in camera* testimony is lifted to the extent that a transcript of his testimony

shall be available to all counsel and he may be deposed concerning said testimony."

Thomas then filed an emergency motion to quash the subpoena. An August 10, 1989, affidavit of Thomas states that the investigation "is presently ongoing." In addition, Thomas states that he believes "that criminal charges will be filed in this matter," and that disclosure of his testimony or the investigatory file would "seriously interfere with my investigation."

On September 6, 1989, a hearing was held. The court explained that the reason it changed custody was "because I thought Mrs. Davis' life [was] still in jeopardy." The court stated further:

"So, what this court is concerned about—Forget Mark Daniels. What this court is concerned about is being informed as to those facts, the continuance of those dangers, or the possibility that the danger has subsided, the possibility that prosecution of the perpetrator is near, the possibility that the prosecution of a perpetrator is impossible because there is no current information. The court is seriously concerned about the possibility that one of the litigants, one of the parents is the perpetrator, and we need more information for the full hearing on permanent custody of these children in order to make an informed decision. That is the court's interest."

The court also stated: "Attorney for Mrs. Davis has told this court in one of his well-known, volatile pitches that this court has stuck the children with the primary suspect in this case. If Detective Thomas knows that and has said that to someone else, he is obligated to speak further on the subject." The court continued:

"And if Detective Thomas knows more about this case than I do, by God, he is obligated to share important information with the court. *** I am saying that if this individual possesses information that is critical, to wit, that this court has made a placement with the only person Detective Thomas feels will ever be indicted with the attempted murder of Ruth Davis, then it is essential to the safety of the children that this court have that information."

The court instructed that Thomas be made available for

"deposition because he owes some good explanations to all of us. And I think he can talk about whether or not this investigation is vital as well as ongoing. And I think he can talk about whether or not there is an arrest or an indictment near. I think he can certainly talk about whether or not there

is any more to say about the likelihood that Mark Daniels is the only viable suspect.

Mark Daniels was mentioned by Detective Thomas in almost a diminishing context, heretofore. It was referred to in the arguments today and also at the trial. Sure, all ex-husbands are suspects. And if there is more to the theory of investigating Mark Daniels than that, then I think it ought to be made known.

I think that it is incredibly important that witnesses, informants, and the names of other suspects be at least for the time protected, and I don't think that it is necessary to knowing, as between Mrs. Davis and Mr. Daniels, who is the more appropriate person for the children to live with, now that I know who else is out there trying to shoot Mrs. Davis. But I think it is incredibly important to know whether or not the circumstances around that shooting were dangerous to the children, and if they would persist and create a climate that would be dangerous to custody, visitation, or to both.

And with those being the guidelines, I would say that you should consider that the file is protected subject to those avenues of discussions, and that I do not believe that any of us has an absolute right to access to the file. Neither do I believe that the state has an absolute right to close that file to us."

The court further found the law enforcement investigatory privilege was not absolute.

"I think it would be absolutely inappropriate for me to say the privilege is absolute. This unfortunate case which has arisen only because of the attack on Mrs. Davis has created accidental circumstances that put[ ] all of these problems in contact with each other and in tension with each other. And I do not perceive that anyone in legislative, or in any trial court, or reviewing court level has ever imagined what would happen under a case like this."

On October 11, 1989, the court issued a written order stating that Thomas must appear for deposition, and that a representative of the Attorney General's office file an affidavit providing specific descriptions of every item in the investigatory file "so that the court can determine, after argument, which of said items shall be disclosed in advance of said deposition."

On December 11, 1989, the court entered a protective order in regard to Thomas' motion to quash subpoena. Certain records were to be produced, while other records were not to be disclosed.

On April 3, 1990, Daniels moved for the entry of a contempt finding against Thomas, pursuant to Illinois Supreme Court Rule 219 (134 Ill. 2d R. 219), for his failure to answer, at a March 27, 1990, deposition, any question related to the investigation except those covered by the documents produced.

On April 16, 1990, Thomas again appeared for deposition and asserted the law enforcement privilege in refusing to answer certain questions. On the same day, the parties appeared before the court and argued the propriety of the questions put to Thomas. At that hearing those questions, which are the subject of this appeal, were described by the attorney for petitioner-appellee, Mark Daniels, as follows:

"I asked him about whether he was pursuing any leads in his investigation of the shooting of Ruth Davis, and he said yes, and I asked him what was the most recent lead that he obtained in pursuit. He said last Thursday, which is April 12th, and I asked what lead did you pursue, and there was an objection. I asked him what the source of that lead was, and I explained that by 'source' I meant whether it was through some investigation of material things found at the scene of the crime or anything like that, and there was an objection, and he was instructed not to answer. I asked him whether there are any present suspects in that shooting, and he refused to answer. I asked if Mark Daniels was a suspect, and he refused to answer. I asked him if Joe Dunser is a suspect, and he refused to answer. I asked him in what way would the disclosure of whether he disclosed to Ruth Davis the name of Joe Dunser how that would impede his investigation, and he refused to answer. I then went into—I asked him whether or not he is in the process of preparing a case for the Grand Jury, and he refused to answer. I asked him whether—I reminded him that at the trial of this case on November 3rd of 1988 he indicated there were four suspects, and I asked whether they still are suspects in these proceedings, and he refused to answer. I asked him whether any informant has given him any direct testimony that he testified to at the original proceedings other than Mark and Greg Daniels being two of the suspects, and he said there were two others. We went in camera, and there was an objection

as a result of me questioning him on what we had obtained from the in camera hearing, and I indicated to counsel that as far as I am concerned, since the deposition was closed, that it is my understanding—and since all the parties to the deposition had been privy to the in camera hearing because the Court did release the transcript to all of the parties concerned—that I could carry my investigation further on that, and Mr. Solberg said he will not answer. I asked him whether he is able to obtain a statement from that informant, that he indicated that he had not yet obtained a statement at the time of the hearing on November 3rd, and he refused to answer, and I asked him whether he found the two people that he was looking for at that time, being the people whose names were given to him by that informant, and he refused to answer that question."

The court again stated its intent to determine if:

"A, [the children are] in the home of a murderer or one who has taken steps to attempt the murder of another person; B, it is possible that I could put the children in the home of a person who is in the line of fire for a yet unarrested perpetrator of an attempted murder. C, it is possible that I could put the children in the home of a person who is involved in dangerous criminal activity, including but not limited to the sale or use of narcotics or other illegal substances."

The parties and the court then agreed that the question would have to be appealed, and that the vehicle for such appeal would be to hold Thomas in contempt. The court stated: "So, as I see it now, having tried my darndest on this record for the sake of my reviewing colleagues upstairs, I see nothing else but to order Detective Thomas to answer each and every one of the questions that have been put to him thus far, and I would find a refusal under that to establish the detective as being in contempt of the court's order ***."

Initially the court refused to impose sanctions for the civil contempt, apparently because Thomas was not a party. Subsequently, the court decided to impose sanctions as motivation to proceed with the appeal.

On April 30, 1990, the court denied Thomas' oral motion to stay the contempt finding.

On May 2, 1990, the court entered a written order finding Thomas in contempt and fining him $1,000 per day for each day he refused to comply. The order reads, in relevant part:

"[T]he parties having appeared before this Court, during the taking of the deposition [of Thomas], for the purpose of requesting the Court's guidance in determining whether certain questions should be answered by Sargeant [*sic*] Donald Thomas; and the Court having ordered the Deponent to, in fact, answer all questions thus far put to him by *** attorney for [Daniels]; and the Depondent [*sic*], through his attorney *** having informed the Court that regardless of the Court's Order, Deponent still refuses to answer said questions; and the Court having heard argument of counsel relative to said issue;

IT IS HEREBY ORDERED AS FOLLOWS:

1. That Sargeant [*sic*] Donald Thomas is hereby found in Contempt of Court for his refusal to respond to the questions asked of him at his deposition contrary to this Court's Order requiring him to do so.

2. That as sanctions for said Contempt, Sargeant [*sic*] Donald Thomas is fined the sum of *** [$1,000], per day, for each day he continues to refuse to comply with this Court's Order, effective April 16, 1990."

On May 3, 1990, Thomas filed a notice of appeal from the final order dated May 2, 1990; the September 6, 1989, denial of Thomas' motion to quash subpoena; and the June 8, 1989, order permitting Daniels and Davis to depose Thomas and question him on matters covered by his *in camera* testimony.

On May 5, 1990, this court granted Thomas' motion for stay of judgment pending appeal.

On May 18, 1990, the trial court entered an agreed order stating that "the transcript of the deposition of Sgt. Thomas, that is the subject of the instant case, be turned over to any party who so requests it."

OPINION

■ On appeal, the contemnor, Sergeant Thomas, contends that he should not be held in contempt for refusing to disclose privileged information. Under Illinois Supreme Court Rule 219(c), the court may "by contempt proceedings compel obedience by any party or person" to a discovery order. (134 Ill. 2d R. 219(c).) The imposition of sanctions is a matter largely within the discretion of the trial court and will not be disturbed on review absent an abuse of discretion. (*Dyduch v. Crystal Green Corp.* (1991), 221 Ill. App. 3d 474, 582 N.E.2d 302.) In addition, it is well settled that "a contempt

proceeding would be the appropriate method of testing [the] correctness" of a discovery order. *Eskandani v. Phillips* (1975), 61 Ill. 2d 183, 194, 334 N.E.2d 146; *People ex rel. General Motors Corp. v. Bua* (1967), 37 Ill. 2d 180, 189, 226 N.E.2d 6; *Howard v. Forbes* (1989), 185 Ill. App. 3d 148, 150, 541 N.E.2d 685; *Illinois Educational Labor Relations Board v. Homer Community Consolidated School District No. 208* (1987), 160 Ill. App. 3d 730, 741, 514 N.E.2d 465.

■ Traditionally, the trial court is given great latitude in defining the scope of discovery since the range of relevant information includes both facts admissible at trial and that which leads to what is admissible at trial. (*Martinez v. Pfizer Laboratories Division* (1991), 216 Ill. App. 3d 360, 365-66, 576 N.E.2d 311.) On review, the discovery order will not be disturbed absent an abuse of discretion. (*Martinez*, 216 Ill. App. 3d 360, 576 N.E.2d 311.) Nevertheless, the court does not have discretion to compel disclosure of information which is privileged or otherwise exempted by statute or by common law. (See *Monier v. Chamberlain* (1966), 35 Ill. 2d 351, 356, 221 N.E.2d 410.) In the case at bar, we must determine whether Illinois recognizes a privilege for "law enforcement investigatory" information.

■ At the trial level, the person claiming exemption by reason of a privilege from the general rules which compel disclosure has the burden of showing facts which give rise to the privilege. (*Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 119, 432 N.E.2d 250; *Cox v. Yellow Cab Co.* (1975), 61 Ill. 2d 416, 337 N.E.2d 15. See generally, S. Stone and R. Liebman, Testimonial Privileges §9.10, at 514 *et seq.* (1983) (hereinafter Stone and Liebman).) On appeal, the contemnor has the burden of establishing that the failure to comply with the discovery order was justified. *Cedric Spring & Associates, Inc. v. N.E.I. Corp.* (1980), 81 Ill. App. 3d 1031, 402 N.E.2d 352.

Before this court, contemnor attempts to carry this burden by arguing that a law enforcement investigatory privilege exists in Illinois and must be applied in this case to prevent disclosure of the three areas of questioning which were raised at his deposition and which the trial court has ordered him to answer.

■ Privilege doctrine generally holds that privileges are strongly disfavored because they are in derogation of the search for truth. (*United States v. Nixon* (1974), 418 U.S. 683, 710, 41 L. Ed. 2d 1039, 1065, 94 S. Ct. 3090, 3108-09.) Privileges are designed to protect interests which are outside of the truth-seeking process, and

thus privileges must be strictly construed as an exception to the general duty to disclose. (*Martinez v. Pfizer Laboratories Division*, 216 Ill. App. 3d at 367.) Notwithstanding this general disfavor, "[c]ourts generally have acted to prevent related civil litigation, whether between private litigants or with the government from interfering with criminal investigations." Stone and Liebman §9.14, at 525.

This case therefore reveals the tension between the trial court's concern for the physical safety of the children and the police department's need to conduct its criminal investigation into the shooting of the children's mother without revealing the identity of informants, witnesses or certain investigatory techniques.

First, however, we must determine whether Illinois recognizes a law enforcement investigatory privilege. In reaching such a determination, we acknowledge a strong correlation between the existence of such a privilege and the carving out of an analogous exemption under State and Federal Freedom of Information Acts (FOIA). McCormick points out this correlation as follows:

> "Prior to the enactment of the federal FOIA and its state counterparts, a privilege protecting the investigative results of government agencies appears to have been sporadically recognized but ill-defined, frequently being treated as but an aspect of a more comprehensive but amorphous privilege for 'government information.' Clearly, however, disclosure of the files of law enforcement agencies may seriously hamper enforcement efforts by discouraging or compromising confidential informants, disclosing the existence, targets, or methods of investigation, or facilitating defense of a criminal prosecution or civil enforcement proceeding by revealing the nature of the case in preparation. Congress recognized the legitimacy of these concerns in the enactment of a highly specific exemption to the FOIA, which in the most recent iteration of the statute expands its protection to 'records or information compiled for law enforcement purposes.' Today the exemption and the privilege, at least in federal law, seem inextricably intertwined, leaving no practical reason for distinguishing between them.
>
> * * *
>
> With regard to state law in this area, some states expressly confer privilege upon law enforcement records by statute, while others possess 'classical' official information statutes which would cover at least some of such records un-

der the rubric of communications made by or to a public officer in official confidence when the public interest would suffer from disclosure. However, it would appear that where a state FOIA is in effect, state courts will accord that statute primacy in determining the maximum sweep of this privilege." 1 J. Strong, McCormick on Evidence §108(b), at 401-03 (4th ed. 1992).[1]

However, while acknowledging the relevance of FOIA exemptions and related case law, we also keep in mind the principle that the FOIA-type of legislation deals with disclosure to the public generally, not disclosure in response to discovery in litigation. The FOIA does not create an evidentiary privilege. (*Douglas v. Windham Superior Court* (Vt. 1991), 597 A.2d 774, 776 n.2, citing *Friedman v. Bache Halsey Stuart Shields, Inc.* (D.C. Cir. 1984), 738 F.2d 1336, 1344, Toran, *Information Disclosure in Civil Actions: The Freedom of Information Act and the Federal Discovery Rules*, 49 Geo. Wash. L. Rev. 843, 849 (1981).) Thus, the mere existence of exceptions to the FOIA is not *dispositive* of a discovery request. (See *Freidman*, 738 F.2d at 1344; *Ruark v. Boarwright* (W.D. Mo. Dec. 18, 1989), No. 88—5109—CV—SW—8; see also 49 Geo. Wash. L. Rev. at 849.) Instead, the courts rely on the FOIA exemptions to "guide the court in appraising public policy concerns and weighing those concerns together with the needs of litigants in the discovery process, which concerns are no less a vital aspect of public policy. Statutory exemptions may be based on 'values entitled to weighty consideration.' Note, *Discovery of Government Documents and the Official Information Privilege*, 76 Colum. L. Rev.

---

[1]Similarly, commentators recognize that "the scope of the [governmental information privilege] has been expanded by judicial interpretation of Exemption 7 of the [FOIA]." (Stone and Liebman §9.01, at 498.). "The [FOIA] has substantially affected the scope of the privileges available to the government in litigation because as a practical matter litigants may use documents in court which have been obtained pursuant to FOIA. Although the exemptions from disclosure under FOIA correspond roughly to most of the common law privileges the government may invoke, the policy of broad disclosure underlying the act and the particularities of its language and legislative history have affected the balance of interests underlying the privileges and the manner in which they are construed in individual cases. Nevertheless, although the Supreme Court has held that the discovery rules can only be applied under FOIA 'by way of rough analogies' [*E P A v. Mink* (1973), 410 U.S. 73, 86, 35 L. Ed. 2d 119, 131, 93 S. Ct. 827, 835], courts often do not distinguish clearly between the privileges as applied under the FOIA and the privileges available in other contexts, and cases decided under the FOIA are thus an important source of law on the scope of the privileges." Stone and Liebman §9.03, at 500-01.

142, 153 (1976); see *McClain v. College Hospital*, 99 N.J. at 357, 492 A.2d at 996; see also *Advisory Committee Notes, Rule 509, Proposed Federal Rules of Evidence*, Revised 1971 Draft, 56 F.R.D. 183, 253 (1972) ('[T]he exceptions [to the Freedom of Information Act] are based on values obviously entitled to weighty consideration in formulating rules of evidentiary privilege')." *Douglas v. Windham Superior Court*, 597 A.2d at 788 (Peck, J., concurring in part and dissenting in part).[2]

Thus, although not dispositive, "[t]he relation between discovery procedures and FOIA exemptions is well-established." (*Friedman*, 738 F.2d at 1344, citing *Verrazzano Trading Corp. v. United States* (Cust. Ct. 1972), 349 F. Supp. 1401, 1403.) "These protected [FOIA exemptions] reflect a congressional judgment that certain delineated categories of documents may contain sensitive data which warrants a more considered and cautious treatment. In the context of discovery of government documents in the course of civil litigation, the courts must accord the proper weight to the policies underlying these statutory protections, and to compare them with the factor supporting discovery in a particular lawsuit." *Friedman*, 738 F.2d at 1344, citing *Black v. Sheraton Corp. of America* (D.C. Cir. 1977), 564 F.2d 531, 547 (recognizing existence of qualified privilege for law enforcement investigatory files). See also *Marshall v. Elward* (1980), 78 Ill. 2d 366, 373, 399 N.E.2d 1329 (stating with respect to the Federal FOIA, "Petitioner concedes that the common law privileges asserted are codified in FOIA. (5 U.S.C. secs. 552(b)(7)(A), (b)(7)(D) (1976))").

We therefore go on to examine the relevant Illinois FOIA exemption for law enforcement investigatory information.

---

[2]There is no indication that Congress endorsed the law enforcement investigatory files privilege through the passage of the FOIA. (5 U.S.C. §§522(b)(7), 522a(k) (1976).) "[I]t is disclosure, not secrecy, that is the dominant objective of the act. Therefore, the Act's *** exemptions are to be narrowly construed. Secondly, the exemptions of the FOIA do not create by their own force a privilege within the meaning of Fed. R. Civ. P. 26(b)(1) disqualifying a government document from discovery. *Pleasant Hill Bank v. United States*, 58 F.R.D. 97, 101 (W.D.Mo. 1973). Although the court acknowledges that Congress has recognized the sensitivity of investigative files by creating the exemptions in the FOIA the court nevertheless finds that the primary purpose behind the Act is to promote an informed citizenry, and not to create an evidentiary shield behind which the government can hide. *N.L.R.B. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 243 (1978). There, the court will deny the United States' motion to quash the subpoena based upon a claim of privilege pursuant to the FOIA." *Ruark v. Boatwright*, (W.D.Mo. Dec. 18, 1989), No. 88–5109–CV–SW–8.

■ The protection of law enforcement records and information is recognized in the *Illinois* Freedom of Information Act, which exempts from inspection:

"Records compiled by *** any law enforcement or correctional agency for law enforcement purposes or for internal matters of a public body, but only to the extent that disclosure would:

(i) interfere with pending or actually and reasonably contemplated law enforcement proceedings conducted by any law enforcement or correctional agency;

\* \* \*

(iv) unavoidably disclose the identity of a confidential source or confidential information furnished only by the confidential source;

(v) disclose unique or specialized investigative techniques other than those generally used and known or disclose internal documents of correctional agencies related to detection, observation or investigation of incidents of crime or misconduct;

\*\*\*

(vii) endanger the life or physical safety of law enforcement personnel or any other person; *or*

(viii) obstruct an ongoing criminal investigation." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 116, par. 207(1)(c).

It is therefore manifest that the exemption carved out under Illinois' FOIA for law enforcement investigatory files is indicative as well as consistent with the existence of a policy favoring qualified protection of such files from court discovery as well. Similarly, a policy favoring qualified protection of police files against casual public access is manifest under the provisions of section 7 of the Criminal Identification Act (Ill. Rev. Stat. 1989, ch. 38, par. 206–7), which prohibits making public records of the Department of State Police except as provided therein.

While our supreme court has not directly addressed the question with respect to State law enforcement investigatory files, it has made reference to the existence of a law enforcement investigatory privilege albeit with respect to investigatory files compiled by the United States Occupational Safety and Health Administration (OSHA). In *Marshall v. Elward*, petitioner argued that disclosure of certain OSHA files would jeopardize pending law enforcement investigations. Petitioner relied on the common law privileges of investigatory file privilege and informer's privilege. Although as

noted earlier, the court found these privileges to have been codified under the Federal FOIA statute (5 U.S.C. §§552(b)(7)(A), (b)(7)(D) (1976)), nevertheless, it did not dispute the contention of the petitioner that these privileges originated under the common law. The court noted that "[t]hese privileges, however, are qualified privileges." (*Marshall v. Elward*, 78 Ill. 2d at 374.) The court expressly "agree[d] with petitioner that the records sought are subject to an investigatory file privilege and an informer's privilege." (*Marshall v. Elward*, 78 Ill. 2d at 374.) The court concluded, however, that portions of the investigatory file could be disclosed. The Illinois Supreme Court, on its own motion, directed the trial court to reexamine the file and determine which items were not protected by privilege and enter an order to produce those documents. *Marshall v. Elward*, 78 Ill. 2d at 375. *Cf. Lopez v. Fitzgerald* (1979), 76 Ill. 2d 107, 390 N.E.2d 835 (access to building inspection reports was denied where access was sought under Local Records Act (Ill. Rev. Stat. 1975, ch. 116, par. 43.101 *et seq.*)).

■ Thus, legislation and case law in Illinois point to Illinois' recognition of the existence of a qualified privilege for law enforcement investigatory information. (See also Ill. Rev. Stat. 1989, ch. 38, par. 206—7 (which purports to provide limited protection to records in the custody of the Department of State Police "other than as provided in this Act or other State law, or when a governmental unit is required by state or federal law to consider such information in the performance of its duties").) We also note that no other jurisdiction which has faced this issue has refused to adopt or recognize the privilege.

Wigmore's categorization of the various types of governmental privileges, including a "topical privilege for facts constituting *secrets of state*, and this, by extension, has often been made to include a privilege for matters constituting so-called *official information*." (Emphasis in original.) (8 J. Wigmore, Evidence §2368, at 745-46 (McNaughton rev. ed. 1961).) Thus, a privilege protecting public officers from the disclosure of certain kinds of facts or communications received through their official duties "undoubtedly exists." 8 J. Wigmore, Evidence §2378, at 792 (McNaughton rev. ed. 1961). See also Stone and Liebman §9.01, at 498 (discussing the common law's recognition of a qualified privilege for information obtained for law enforcement purposes).

Both Federal and State courts have recognized the qualified privilege for law enforcement investigatory information.[3] For example, one court stated: "There surely is such a thing as a qualified common-law privilege *** for law-enforcement investigatory files." *Friedman v. Bache Halsey Stuart Shields, Inc.* (D.C. Cir. 1984), 738 F.2d 1336, 1341, citing *Black v. Sheraton Corp. of America* (D.C. Cir. 1977), 564 F.2d 531, 541-42.

"The law enforcement investigative privilege, a qualified common law privilege under Fed. R. Civ. P. 26(b), exists to prevent 'the harm to law enforcement efforts which might arise from public disclosure of ... investigatory files.'" (*Raphael v. Aetna Casualty & Surety Co.* (S.D.N.Y. 1990), 744 F. Supp. 71, 74, quoting *Black v. Sheraton Corp. of America* (D.C. Cir. 1977), 564 F.2d 531, 541.) "The privilege serves to preserve the integrity of law enforcement techniques and confidential sources, to protect witnesses and law enforcement personnel, to safeguard the privacy of individuals under investigation and to prevent interference with the investigation. [Citation.] Law enforcement operations have little hope of being effective if conducted in full public view." *Raphael*, 744 F. Supp. at 74.

For other courts recognizing the privilege, see, *e.g.*, *In re Department of Investigation* (2d Cir. 1988), 856 F.2d 481 (law enforcement privilege protects records of commission investigating conduct of a city official, related to Federal criminal investigation; possibility of exposing confidential sources was too great, law enforcement techniques would be revealed, would deter witnesses from cooperating); *Black v. Sheraton Corp. of America* (D.C. Cir. 1977), 564 F.2d 531; *Center for National Policy Review on Race & Urban Issues v. Weinberger* (D.C. Cir. 1974), 502 F.2d 370, 373; *Bristol-Myers Co. v. Federal Trade Comm'n* (D.C. Cir. 1970), 424 F.2d 935, 939; *Koehler v. United States of America* (D.D.C. Dec. 9, 1991), No. 90—2384 (court finds that certain documents are protected from discovery by the law enforcement investigatory file privilege); *Keenan v. City of Philadelphia* (E.D. Pa. Dec. 19, 1989), No. 88—7156 (court orders defendant to produce only documents which do not relate to ongo-

---

[3]Notably, Proposed Rule 509 of the Federal Rules of Evidence included "investigatory files compiled for law enforcement purposes" under governmental privileges. (Proposed Rules adopted by Supreme Court at 56 F.R.D. 183 (1972).) Although Congress did not adopt the rule, the proposed rules have been used by courts as guides in interpreting the common law. See, *e.g.*, *Diversified Industries, Inc. v. Meredith* (8th Cir. 1977), 572 F.2d 596, 605 n.1.

ing police investigations; no danger of revealing confidential sources or law enforcement techniques); *Ruark v. Boatwright* (W.D. Mo. Dec. 18, 1989), No. 88—5109—CV—SW—8 (court finds law enforcement investigatory files privilege does not prevent disclosure); *Desper v. Montgomery County* (E.D. Pa. May 31, 1989), No. 88—4212 (court agrees to examine documents in *in camera* hearing to determine which fall within the realm of ongoing criminal investigations); *Mehau v. Gannett Pacific Corp.* (1983), 66 Haw. 133, 658 P.2d 312 (pendency of criminal investigation is reason for denying discovery of investigative reports), citing *Swanner v. United States* (5th Cir. 1969), 406 F.2d 716, 719; *Tighe v. City & County of Honolulu* (1974), 55 Haw. 420, 422, 520 P.2d 1345, 1346-47 (the court held that the "[p]ublic interest in preservation of confidentiality and secrecy may be sufficient reason for insulation of police or other governmental records from discovery in special, individual cases"); *Reinstein v. Police Commissioner* (1979), 378 Mass. 281, 290, 391 N.E.2d 881, 886; *McClain v. College Hospital* (1985), 99 N.J. 346, 357, 492 A.2d 991, 996; *Beck v. Bluestein* (1984), 194 N.J. Super. 247, 257, 262-63, 476 A.2d 842, 846, 849; *City of Miami Beach v. Town* (Fla. App. 1979), 375 So. 2d 866 (question concerning ongoing police investigation may compromise the investigation as well as cause actual physical danger to those involved).

Based upon the foregoing reasons, we agree with the trial court that a limited privilege for law enforcement investigatory information is operative in Illinois, even though not fully codified by statute or rule.

█ At issue here is both testimonial and documentary evidence. We agree with the holding in *In re Sealed Case* (D.C. Cir. 1988), 856 F.2d 268, where the court explained that the law enforcement investigatory privilege would apply equally to documents and to testimony about information contained in the files. "It make[s] little sense to protect the actual files from disclosure while forcing the government to testify about their contents. The public interest in safeguarding the integrity of on-going civil and criminal investigations is the same in both situations. The privilege may be asserted to protect testimony about or other disclosure of the contents of law enforcement investigatory files." (856 F.2d at 271.) Thus, the privilege might apply to both Sergeant Thomas' testimony and any police documents he would be asked to produce.

Once the privilege is recognized, the "case law on the investigatory files privilege is clear that a minimum showing is required before the court must balance the interests, and the precedents are

relatively consistent on what must be in that showing." (*Douglas v. Windham Superior Court*, 597 A.2d at 780, citing *Friedman v. Bache Halsey Stuart Shields, Inc.* (D.C. Cir. 1984), 738 F.2d 1336, 1342.)

> "The party seeking to invoke the privilege bears the burden of justifying its application. [Citations.] The government must specify 'which documents or class of documents are privileged and for what reasons.' [Citation.] This threshold showing must explain the reasons for nondisclosure with particularity, so that the court can make an intelligent and informed choice as to each requested piece of information. 'Unless the government, through competent declarations, shows the court *what interests* [of law enforcement or privacy] would be harmed, *how* disclosure under a protective order would cause the harm, and *how much* harm there would be, the court cannot conduct a meaningful balancing analysis.' [Citation.] If the police make no such showing, the court has 'no choice but to order disclosure.' [Citations.]" (Emphasis in original.) *King v. Conde* (E.D.N.Y. 1988), 121 F.R.D. 180, 189.

See also *In re Sealed Case* (D.C. Cir. 1988), 856 F.2d 268, 272 (The law enforcement investigatory privilege is qualified. "The public interest in nondisclosure must be balanced against the need of a particular litigant for access to the privileged information").

■■ In regard to the privilege for information obtained for law enforcement purposes, the common law has generally recognized (1) a privilege protecting information gathered in the course of an enforcement investigation or proceeding, (2) a privilege against disclosing the identity of informers, and (3) a privilege for information which might compromise the effectiveness of novel investigative techniques. See generally Stone and Liebman §§9.01, at 498, 9.14, at 525.

The specific questions in dispute at the time of the entry of the contempt order were as follows:

(a) What lead did you pursue?

(b) Did the lead you pursued concern itself with narcotics?

(c) From what source did that lead come?

(d) Who are those suspects?

(e) Did you disclose the name of Joe Dunser to Ruth Davis as a possible suspect in these proceedings?

(f) Have you disclosed any information concerning your investigation to Ruth Davis aside from that which could be

gleaned from your testimony in court and the documents that you produced?

(g) Are you in the process of preparing to go to the grand jury on this case?

(h) Are any of the four suspects at that time still suspects in this proceeding?

(i) And at that time (when you testified *in camera* on November 3rd, 1988) you gave an indication that there was an informant who had information concerning two of the suspects, is that correct?

(j) Have you been able to obtain a statement from that informant?

(k) You testified on November 3rd *in camera* about two people that the informant indicated had involvement in the shooting of Ruth Davis. Have you found these two people and questioned them?

We note, however, that at oral argument the appellant disclosed that since the appeal was filed, the investigation of the shooting was closed evidently without any charges being filed against anyone. As a result, the appellant further indicated that there was no longer any objection to naming suspects. However, the State still retained an interest in protecting confidential sources and investigatory techniques. The attorney for the children stated during oral arguments that he did not find a need to ascertain the actual identity of any informants. Thus, those questions which do not involve informants are no longer in contention.

■■ The extension of the privilege requires a court to determine whether disclosure would be contrary to public interest. The criteria which should be weighed in any such determination have been effectively reduced to a list of 10 factors by the court in the widely cited case of *Frankenhauser v. Rizzo* (E.D. Pa. 1973), 59 F.R.D. 339, 344. We list those 10 factors here and note their applicability to this case.

(1) *The extent to which disclosure will thwart governmental processes by discouraging citizens from giving the police information*: It is widely recognized that witnesses to a crime will not speak candidly if they believe that disclosure to litigants is possible. A more likely result of disclosure of identities of citizens who relayed significant information to the police is that candor will be chilled. *Raphael v. Aetna Casualty & Surety Co.*, 744 F. Supp. 71.

(2) *The impact upon persons who have given information of having their identities disclosed*: In contrast with the disclosure of

the identities of witnesses to events surrounding the shooting, the police often have a serious interest in protecting the name of informants. The purpose of the government's privilege to withhold the identity of informants is to protect the public interest in effective law enforcement by encouraging citizens to communicate their knowledge of the commission of crimes to law enforcement personnel. *Roviaro v. United States* (1957), 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623.[4]

Here, each of the questions can be answered without disclosing the names or identities of any such informants whose cooperation was premised expressly or implicitly on an expectation that their identities would be kept secret.

This is true even with respect to those questions to which the State's objections still persist. A simple review of those questions demonstrates this point.

(a) "What lead did you pursue [four days before the deposition]?" Thomas should be able to answer this question without identifying an informant's name.

(b) "Did the lead that you pursued concern itself with narcotics?" Again, Thomas should be able to answer this question without revealing his informant. The information may not prove relevant in the ultimate permanent custody decision, particularly since Thomas did testify that the lead did not prove fruitful, and Thomas had abandoned the lead. However, it may lead to other relevant information.

(c) "From what source did that lead come?" If indeed the source is an informant, Thomas should be able to say so, and to indicate whether this informant has been previously used by the police, or other general information.

(f) "You testified on November 3rd *in camera* about two people that the informant indicated had involvement in the shooting of Ruth Davis. Have you found those two people and questioned them?" In asking for the names of suspects, there is clearly no problem, since the Attorney General is now will-

---

[4]In discussing the law enforcement investigatory privilege, McCormick notes: "Of course, to the extent that the privilege here is redundant with the informer's privilege, it may resist following the proceeding." J. Strong, McCormick on Evidence §108(b), at 402 n.34 (4th ed. 1992), citing *Swanner v. United States* (5th Cir. 1969), 406 F.2d 716 (action by informer against government for failing to protect him; files could be granted to plaintiff but only after redaction of material relating to other informers).

ing to release that information. There is no need to provide the identity of the informants in answering this question.

(j) "Have you been able to obtain a statement from that informant?" Again, the Attorney General stated at oral arguments that there was an objection *only* if the statement identifies the informant. Thus, Thomas should be able to answer this question with a simple "yes" or "no." If the substance of the statement is sought, the trial court will then have to determine whether the substance reveals the identity of the informant.

(3) *The degree to which government self-evaluation and consequent program improvement will be chilled by disclosure.*

(4) *Whether the information sought is factual data or evaluative summary*: Factors 3 and 4 do not really pertain to the questions before us. We note only in passing that courts sometimes find the privilege more likely to apply to evaluative summaries and policy recommendations than to factual data. See, *e.g.*, *Jupiter Painting Contracting Co. v. United States* (E.D. Pa. 1980), 87 F.R.D. 593, 597 ; *Wood v. Breier* (E.D. Wis.,1972), 54 F.R.D. 7, 12.

(5) *Whether the party seeking the discovery is an actual or potential defendant in any criminal proceedings either pending or reasonably likely to follow from the incident in question*: Here, petitioner sought the discovery and may have been a potential defendant in a .criminal proceeding, but it is now closed. There is no danger, for example, that petitioner would be able to obtain materials here that he would not have been permitted to obtain through the criminal discovery proceedings.

(6) *Whether the police investigation has been completed*: While the police investigation remained open at the time the trial court entered the contempt order, the Attorney General at oral argument stated that it has now been completed. "When an investigation has been completed, the consensus is that a litigant should be allowed access to law enforcement files." (Note, *Discovery of Government Documents and the Official Information Privilege*, 76 Colum. L. Rev. 142, 158-59 (1976) (and cases cited therein).) While this factor is not dispositive, it is entitled to significant weight in the balancing process. See, *e.g.*, *United States v. Leggett & Platt, Inc.* (6th Cir. 1976), 542 F.2d 655, 659; *Capitol Vending Co. v. Baker* (D.D.C. 1964), 35 F.R.D. 510, 511; *Mehau v. Gannett Pacific Corp.* (1983), 66 Haw. 133, 156, 658 P.3d 312, 327; *Laws v. Thompson* (1989), 78 Md. App. 665, 691, 554 A.2d 1264, 1277.

We would agree that although "it has been said that the privilege \*\*\* expires with the governmental undertaking to which the privileged matter relates, this seems an overly broad generalization." (1 J. Strong, McCormick on Evidence §108(b), at 401-03 (4th ed. 1992).) The need to protect the informants' names remains despite the closing of the police file.

(7) *Whether any \*\*\* disciplinary proceedings have arisen or may arise from the investigation*: There is no indication that this factor has any relevancy here.

(8) *Whether the plaintiff's suit is nonfrivolous and brought in good faith*: In custody disputes, there is the potential for the parent having (even temporary) custody of the children to misuse the ordinary delays hampering the judicial system to keep the children for as long as possible, and then later argue that the children should not be forced to make another move after so many years with the custodian. Here, however, there is no claim that the father acted in bad faith when he filed the custody petition following the shooting of the mother. Of course, if there was evidence that petitioner had shot the respondent and then convinced the trial court to transfer custody of the children from the mother to him on the basis that the mother had been shot, petitioner's good faith would, to say the least, be in question. We are not unmindful of the fact, however, that the mother lost custody of her two young children five years ago due to the fact that she was shot. She was not disabled or unable to care for the children. Nevertheless, she has lost five years of custody, and the children have been living with a great deal of tension as accusations of murder and drug abuse are thrown back and forth between the parents.

Despite the potential for abuse of the legal system here, we see nothing in the record indicating that the trial judge believed, or that would lead this court to believe, that petitioner has successfully duped the court into granting his temporary custody petition and stretching "temporary" into five years of litigation *prior* to ever having a full trial on the permanent change of custody issue.

(9) *Whether the information sought is available through other discovery or from other sources*: Here, only the police could provide the information sought in the deposition questions which were presented to us.

(10) *The importance of the information sought to the plaintiff's case*: Under section 610(b) of the Illinois Marriage and Dissolution of Marriage Act, the changed circumstances of the child or child's custodian which affect the best interests of the child shall be

ground for modifying custody. Ill. Rev. Stat. 1989, ch. 40, par. 610(b).

We are not reviewing the custody decision on appeal here beyond the fact that we cannot ignore the contextual setting of the contempt order which we are reviewing. We merely note that, in general, in a custody proceeding, the trial court is primarily concerned with the best interest of the children and to ignore the criminal investigation would be "to ignore the primary focus of the proceedings, the safety of the children, and common sense." *In re Marriage of Engelbach* (1989), 181 Ill. App. 3d 563, 573, 537 N.E.2d 372 (at custody hearing, father may introduce evidence of criminal record of mother's new husband).

Obviously the question here of whether the father was to be indicted for the attempted murder of the mother or whether the mother endangered her safety and the safety of her children through drug-related activities was extremely important to a change of custody decision. To permit the parties and the court to receive as much information as possible without endangering the informants involved in the criminal investigation would not be violative of the qualified privilege.

The trial court, in deciding whether the temporary custody order was justified, and what permanent custody order should be entered, cannot ignore either the shooting incident or the drug-related allegations. While the custody proceedings do not require proof beyond a reasonable doubt of either parent's wrongdoing, the court can accord the proper weight to any allegations, depending on the factual basis supporting them.

Next, in regard to a factor related to these *Frankenhausen* factors, the State Police have argued consistently that it would be detrimental to the police to reveal their investigative *techniques*. Some courts have recognized a limited privilege where revelation of the government's technique would compromise the usefulness of it in future criminal investigations. See, *e.g., United States v. Bell* (2d Cir. 1972), 464 F.2d 667, 670-71 (hijacker profile); *United States v. Orzechowski* (7th Cir. 1976), 547 F.2d 978, 983-84 (test methods for determining isomers of cocaine); *Librach v. Federal Bureau of Investigation* (8th Cir. 1978), 587 F.2d 372, 373 (information about the FBI's witness protection program); *Malloy v. United States Department of Justice* (D.D.C. 1978), 457 F. Supp. 543 (security devices at banks); *Ott v. Levi* (E.D. Mo. 1976), 419 F. Supp. 750, 752 (techniques for investigating arson).

On the other hand, routine techniques such as fingerprinting, ballistics tests and other well-known methods are not protected. Stone and Liebman §9.22, at 535, citing H.R. Rep. No. 1380, 93d Cong., 2d Sess. (1974).

In the present case, only a broad claim that investigatory techniques will be disclosed has been asserted by the State Police through contemnor Thomas. There is no indication that, *e.g.*, a new technique was used which will be compromised such that criminals will use the information to prevent further investigation into criminal conduct. See Stone and Liebman §9.22, at 534 (privilege limited to circumstances where disclosure would compromise "the usefulness of the technique in future investigations").

■■■ ■ Accordingly, there is no indication that the trial court abused its discretion under the *Frankenhausen* guidelines in balancing these various interests as they were presented when ruled upon, even though at the time of the trial court's ruling the investigation was still apparently ongoing. There was no abuse of discretion in the trial court's determination that the importance of this information in helping determine the case involving the safe placement of the custody of a minor overrode the more general concerns of the State Police in maintaining the secrecy of their then pending investigation. This is clearly the case with respect to those questions which do not touch upon the identity of confidential informants. It is also true with respect to those questions which make reference to informants but do not compel the disclosure of their identities. We therefore find no abuse of discretion in the discovery order entered by the court.

However, we recommend that the trial court review its ruling in light of this opinion, since we have not previously addressed the law enforcement investigatory privilege, and take cognizance of any materially changed circumstances in view of the passage of time since the 1988 shooting.

Finally, we find no abuse of discretion in imposing the sanction of contempt on Sergeant Thomas as a vehicle for appealing this question of first impression. However, we find that the contemnor's refusal to comply with the trial court's order "was a good-faith effort to secure an interpretation of an issue without direct precedent in this State. By subjecting [himself] to a contempt citation, [he] exercised a permissible method of testing a pretrial order." (*Cisarik v. Palos Community Hospital* (1989), 193 Ill. App. 3d 41, 43, 549 N.E.2d 840.) Because the issues here were of first impression in

this court, we vacate the finding of contempt and the $1,000 per day fine.[5]

See *Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 122, 432 N.E.2d 250 ("Since the \*\*\* question concerning the discoverability of Sailors' report involved issues of first impression in this court, the circuit court's order imposing a fine on B-E's attorney for contempt of court will be set aside"); *Sarver v. Barrett Ace Hardware, Inc.* (1976), 63 Ill. 2d 454, 462, 349 N.E.2d 28 ("Since the issue involved in this case is one of first impression in this State, that part of the order of the circuit court imposing a fine on the [contemnor] is vacated"); *Howard v. Forbes* (1989), 185 Ill. App. 3d 148, 152-53, 541 N.E.2d 685 (contempt order and fine entered upon that judgment are vacated where the parties had stipulated that the contempt order was a formal one entered "solely to permit appellate review"); *Cisarik v. Palos Community Hospital,* 193 Ill. App. 3d at 45-46 ("Where noncompliance with [a discovery] order by an attorney raises an issue of first impression, the resulting contempt order and fine shall be set aside"); *Sakosko v. Memorial Hospital* (1988), 167 Ill. App. 3d 842, 848, 522 N.E.2d 273 (vacate contempt fine where contempt order was entered at defendant's request; it is proper procedure to test on appeal a discovery order; defendant was not being contemptuous by holding court in disdain or subjecting it to scorn; and defendant acted in good-faith effort to secure an interpretation of the privileges in question).

---

[5]See also Stone and Liebman §9.10, at 518 (courts are generally disinclined to issue contempt citations against the government when it is not a party in the case).

Wigmore notes that how a court will sanction the government when it refuses to produce material depends "largely upon whether or not the government is a party to the proceeding." (8 J. Wigmore, Evidence §2379, at 815 (McNaughton rev. ed. 1961).) In discussing this topic, Wigmore quotes 4 J. Moore, Federal Practice par. 26.25, at 1167 (2d ed. 1950): " 'Where the Government is not a party, the only sanction which the court has to enforce a discovery order against it is a contempt citation; but it would not be seemly for a federal court to hold a cabinet officer or head of a department in contempt, and certainly not for a state court to do so, and it is doubtful whether the court would have the power to take such action.' " (8 J. Wigmore, Evidence §2379, at 815 n.13 (McNaughton rev. ed. 1961) and cases cited therein).) Thus, when the government is not a party it means the court "probably cannot effectively resort to the sanction of contempt, available against the ordinary third-party witness; the government, because it is not the party in interest, does not have the option voluntarily to suffer defeat, thus making the question of privilege moot." 8 J. Wigmore, Evidence §2379, at 817 (McNaughton rev. ed. 1961).

*Cf. Profesco Corp. v. Dehm* (4th Dist. 1990), 196 Ill. App. 3d 127, 132, 553 N.E.2d 101 (McCullough, J., concurring in part and dissenting in part) (criticizing majority for remanding for limited purpose of permitting trial court to determine whether it wishes to vacate some, none, or all of the fine it imposed; fact that contemnor is a nonparty does not mean the question of "good faith" loses importance).

Since it may arise again on remand, we briefly touch on the reluctance of the trial judge to make an *in camera* inspection of the police file. We understand the dilemma of the trial judge particularly in a bench proceeding since an *in camera* view may expose the trial judge to significant material on an *ex parte* basis, where such material would nevertheless be privileged and unavailable to one or more of the parties. We suggest, however, that this dilemma can be ameliorated administratively by having another judge, who would not preside over the merits, perform the *in camera* inspection and make the resultant discovery determination.

Accordingly, the judgment of the circuit court of Cook County is affirmed in part and vacated in part.

Affirmed in part and vacated in part.

McNULTY, P.J., and MURRAY, J., concur.